FISHER, BROWN & COMPANY *vs.* WILLIAM I. FIELDING.

First Judicial District, Hartford, March Term, 1895. ANDREWS, C. J., TORRANCE, FENN, BALDWIN AND HAMERSLEY, Js.

Unless procured by fraud, a judgment for a pecuniary demand, rendered by a competent court of Great Britain against a Connecticut citizen who was personally served with process within its jurisdiction, is conclusive upon the merits of the cause of action, in a suit brought here for the collection of such judgment. (One judge dissenting.)

In an action upon a judgment of a court of a foreign country, it is unnecessary for the plaintiff specifically to allege that such court had jurisdiction of the parties and subject-matter, that the defendant had reasonable notice of the institution of the suit and a fair opportunity to be heard, or that any hearing or trial was had. These facts are the indispensable conditions of the due adjudication of the foreign court, and are necessarily implied in the averment, (authorized by the Practice Book, Form 169,) that the court "duly adjudged" the defendant should pay, etc.

The motive which prompts the exercise of a legal right is of no importance. Accordingly it is no defense to an action on such a judgment, that the original action was brought when the defendant was about to leave the foreign country after a brief business visit, for the purpose of embarrassing and impeding him and preventing him from having a fair opportunity to defend the suit.

The law and practice determining the form of judicial proceedings in a foreign court may always be shown, and shown by parol.

Whenever a judgment on a copartnership demand may lawfully be rendered in its favor without stating the names of the copartners, such judgment is, in legal effect, one in favor of the individual members of the firm, and may properly be declared on as such, in any proceeding subsequently brought to enforce it.

[Argued March 5th—decided December 16th, 1895.]

ACTION on a judgment obtained in England, brought to the Superior Court in Hartford County and tried to the court, *George W. Wheeler, J.,* upon the plaintiffs' demurrer to the answer of the defendant; the court sustained the demurrer, and thereafter, upon trial, judgment was rendered (*Robinson, J.*) for the plaintiffs, and the defendant appealed for alleged errors in the rulings of the court. *No error.*

The plaintiffs were Joseph B. Clarke and John Edward H. Brown, of Birmingham, England, partners in trade under the name of Fisher, Brown & Company, by which name they recovered, in England, the judgment now sued upon, against the defendant, then and now a citizen of Connecticut.

The complaint merely alleged that on April 3d, 1889, at Birmingham, in the kingdom of Great Britain, the High Court of Justice, Queen's Bench Division, Birmingham District Registry, in an action therein pending between the plaintiffs and the defendant, duly adjudged that the defendant should pay to the plaintiffs the sum of two hundred and ninety-three pounds, thirteen shillings, and three pence damages, and four pounds and fourteen shillings costs, amounting in all to two hundred and ninety-eight pounds, seven shillings and three pence, which in lawful money of the United States is of the value and amount of fourteen hundred and fifty dollars and four cents; and that the defendant had not paid the same.

The defendant demurred for want of allegations that the

court in question had jurisdiction of the alleged action, or of the subject-matter, or of the parties; or that the defendant had notice of the action, or was summoned to appear therein, or did in fact appear; or that there was any hearing or trial. This demurrer was overruled, (*Robinson, J.*).

An answer was then filed, containing four defenses. The first was a general denial. The second defense was that in March, 1889, the defendant, being a citizen of the United States, and an inhabitant of Connecticut, and president of the National Wire Mattress Co., a corporation located at New Britain, in Hartford County, was temporarily at a hotel in Birmingham, in the course of a business trip to England; that just as he was about to make his departure for the United States, the plaintiffs caused to be served upon him, on March 26th, 1889, a summons to appear in eight days in said High Court of Justice, to answer to a writ there brought against him by the plaintiffs; that he was then nowise indebted to them, but any claim they had in which he was in any way interested was one against said National Wire Mattress Company, as they well knew; that they sued him personally at that particular time for the purpose of embarrassing him, and to prevent his having a fair opportunity of defense, unless he prolonged his stay in Birmingham indefinitely, and that they thereby sought to obtain an unjust and unfair advantage over him ; that immediately after such service of process he returned to the United States, and made no appearance, and had no knowledge of any subsequent proceedings in said court, except from the present complaint; and that said court had no jurisdiction over him, and its judgment was null and void. The third defense was that he was never indebted to the plaintiffs. The fourth defense was the same as the second, except that it omitted the allegations that the plaintiffs' claim, if any, was, as they well knew, only against the National Wire Mattress Company, and that they sued, when and as they did, to embarrass the defendant and prevent his having a fair opportunity to make a defense, and thereby to gain an unjust and unfair advantage over him. Demurrers to the second, third and fourth defenses were filed and sustained, (*George W. Wheeler, J.*).

The cause was then heard on the issue of fact before *Robinson, J.* The plaintiffs introduced a certified copy of the record of the High Court of Justice, which read as follows:

" OFFICE COPY.

(Original Filed 26th March, 1889.)

1889, F. No. 549.

In the High Court of Justice, Queen's Bench Division, Birmingham District Registry.

Between Fisher, Brown & Co., *Plaintiffs*, and W. I. Fielding, *Defendant.*

Victoria, by the grace of God, of the United Kingdom of Great Britain and Ireland, Queen, defender of the faith, to W. I. Fielding, of the Queen's Hotel, in the city of Birmingham, We command you that, within eight days after the service of this writ on you, inclusive of the day of such service, you cause an appearance to be entered for you in an action at the suit of Fisher, Brown & Co. And take notice, that in default of your so doing, the plaintiff may proceed therein, and judgment may be given in your absence.

Witness, Hardinge Stanley, Baron Halsbury, Lord High Chancellor of Great Britain, the twenty-sixth day of March, in the year of our Lord one thousand eight hundred and eighty-nine.

STATEMENT OF CLAIM.

The plaintiffs' claim is for balance of account for goods sold and delivered.

*Particulars.*

| 1887. | | £ | s. | d. | 1888. | £ | s. | d. |
|---|---|---|---|---|---|---|---|---|
| Aug. 22, to goods, | | 260 | 7 | 0 | July 27, by draft, | 336 | 4 | 0 |
| "   " | " | 232 | 7 | 6 | 1887. | | | |
| Sept. 12, | " | 168 | 9 | 10 | Dec. 21, by cash, | 68 | 6 | 10 |
| Oct. 22, | " | 350 | 11 | 6 | "  "  "  " | 627 | 19 | 1 |
| "   " | " | 299 | 13 | 10 | | | | |
| 1888. | | | | | | 1032 | 9 | 11 |
| Mar. 3, | " | 12 | 7 | 6 | Balance due, | 293 | 13 | 3 |
| "  11, | " | 2 | 6 | 0 | | | | |
| | | 1326 | 3 | 2 | | 1326 | 3 | 2 |

Fisher, Brown & Co. v. Fielding.

Place of trial, Warwickshire (Birmingham Division).

Signed, J. B. Clarke & Co., and the sum of £2 15s. 0d., or such sum as may be allowed on taxation for costs. If the amount claimed is paid to the plaintiffs or their solicitors within four days from the service hereof, further proceedings will be stayed.

This writ was issued by J. B. Clarke & Co., of 40 Waterloo street, in the city of Birmingham, whose address for services is 40 Waterloo street aforesaid, or at the office of Messrs. H. Tyrrell & Son of 3 Raymond Buildings, Gray's Inn, London, agents for the solicitors for the said plaintiffs, who reside at Lionel street, Birmingham.

OFFICE COPY.

(Original Filed 3d April, 1889.)

1889, F. No. 549.

In the High Court of Justice, Queen's Bench Division, Birmingham District Registry.

Between Fisher, Brown & Co., *Plaintiffs*, and W. I. Fielding, *Defendant*.

I, Arthur Llewellyn Tangye of 40 Waterloo street, Birmingham, in the county of Warwick, clerk to Messrs. J. B. Clarke & Co., of the same place, solicitors for the plaintiffs in this action, make oath and say as follows:

1. I did, on the twenty-sixth day of March, 1889, at the Queen's Hotel, Birmingham aforesaid, personally serve the above-named defendant, W. I. Fielding, with a true copy of the writ of summons in this action, which appeared to me to have been regularly issued out of the Birmingham District Registry of the Supreme Court of Judicature against the above-named defendant, at the suit of the above-named plaintiffs, and which was dated the twenty-sixth day of March, 1889.

2. At the time of the said service the said writ and the copy thereof were subscribed and indorsed in the manner and form prescribed by the rules of the Supreme Court.

3. I did, on the twenty-sixth day of March, 1889, indorse

on the said writ the day of the week and the month of the said service.

. ARTHUR L. TANGYE.

Sworn at Birmingham in the county of Warwick, this 3d day of April, 1889.

Before me,

A. W. FREEMAN.

A commissioner to administer oaths in the Supreme Court of Judicature.

This affidavit is filed on behalf of the plaintiffs.

OFFICE COPY.

(Original Filed 3d April, 1889.)

1889, F. No. 549.

In the High Court of Justice, Queen's Bench Division, Birmingham District Registry.

Between Fisher, Brown & Co., *Plaintiffs*, and W. I. Fielding, *Defendant.*

Final judgment on non-appearance, 3d April, 1889. The defendant, W. I. Fielding, not having appeared to the writ of summons herein, it is this day adjudged that the plaintiffs recover against the said defendant, £293 13s. 3d., and £4 14s. 0d. for costs."

The identity of the defendant in the action which was the subject of this record, with the defendant in the present action, and the fact of the service of the summons upon him on March 26th, 1889, were admitted ; but he objected to the admission of the copy of the record, on the ground that it did not purport to be a record of a judgment in favor of the plaintiffs, but only of Fisher, Brown & Company ; that it did not disclose whether Fisher, Brown & Company was a corporation, a copartnership, or an individual trading by that name, nor, if a copartnership, who were the copartners ; and did not show that the plaintiffs were copartners.

Thereupon the plaintiffs introduced certain depositions tending to prove that the plaintiffs were bedstead manufacturers, and throughout the year 1889 were copartners, under

the firm name of Fisher, Brown & Company, and were the only persons interested in the judgment recovered, or the claim out of which it arose; and that by the English Rules of Court under the Judicature Act, suits could be brought and maintained by a partnership in the firm name, without specifying who were the partners. These depositions were admitted against the objection of the defendant that they were not receivable to help out or supplement the record, or to show that Fisher, Brown & Company was a firm name, or who the copartners were; and that they did not purport to show that the plaintiffs were members of such a firm when the contract sued upon in England was made.

The court found from the evidence that by the law of England the names of the partners need not be stated in complaints by or judgments in favor of a copartnership; admitted the copy of the record; and, no evidence being offered in defense, rendered a judgment for the plaintiffs for the full amount of the judgment and interest; from which judgment the defendant took this appeal.

*Frank L. Hungerford*, with whom was *John H. Kirkham*, for the appellant (defendant).

I. Is a citizen of the United States and of the State of Connecticut, who is temporarily upon English soil, and who is served with process to appear in Her Majesty's Court of Justice, bound to appear therein and defend, or else be conclusively bound by a judgment the world over, which has been obtained without a trial upon the merits, but by default only?

It will be observed that the question, as above stated, takes at once out of the discussion, the effect of foreign judgments in the following cases: (*a*) Judgments *in rem*. (*b*) Judgments defining the *status* of individuals. (*c*) Judgments obtained in cases in which our citizens have been voluntary plaintiffs in a foreign jurisdiction. (*d*) Judgments obtained in cases in which our citizens have appeared as defendants and gone to trial upon the merits, either to save property attached in the foreign jurisdiction, or voluntarily to save

themselves from a judgment *in personam*.  (*e*) Judgments against American citizens in a foreign country, not temporarily but as residents for a longer or shorter period, either for the purposes of business or pleasure, and therefore owing some sort of duty to the foreign country.

It is not necessary for the determination of this case that we should undertake a review of all the decisions, English and American, as to the effect of foreign judgments, much less that we should undertake to reconcile those decisions or the *dicta* contained therein.  The most that can be said is that foreign judgments are sometimes conclusive, and sometimes they are not.  Whether they are or not, depends altogether upon the circumstances under which they were obtained.

The principle upon which any foreign judgment is held in this country to be conclusive, is that justice has already been done between the parties to it, according to the standard of justice as administered in our courts.  It is not in any degree a matter of international comity.  Our government owes it to all its citizens to see that they have at least one fair opportunity to try their causes at such times, in such places, and under such circumstances that justice—not necessarily justice according to the idea of the nation in whose tribunals the cause has been tried, but justice according to the American idea—has been done.

The cases generally will be found, with some unimportant exceptions, to fall within the general principle above stated; and it is quite safe to say that no case can be found, either English or American, that holds that a citizen of any country temporarily in a foreign land, and there sued and not appearing, but standing upon his rights of citizenship, is bound by a judgment against him by default, even though he was summoned to appear and defend.  *Schibsby* v. *Westenholz et al.*, L. R. 6 Q. B. D., 155 ; *Trumbull et al.* v. *Walker*, 67 L. T. R. (Q. B. D.) N. S., 767 ; *Rousillon* v. *Rousillon*, L. R. 14 Ch. Div., 351 ; *General Steam Navigation Co.* v. *Guillon*, 11 M. & W., 877 ; *Voinet* v. *Barrett*, 65 Law J. N. S. Q. B., 39 ; 2 Freeman on Judgments (4th Ed.), 597 ; *Hilton et al.* v.

*Guyot et al.*, 159 U. S., 113, 42 Fed. Rep., 249, and cases therein cited.

II. The plaintiffs had no just claim against the defendant, and they knew it; they took advantage of the defendant's temporary presence in England to obtain a judgment to which they knew they were not entitled; their object in suing him in England was to embarrass him and to prevent his having a fair opportunity to resist an unjust demand; they sought to obtain an unjust and unfair advantage over the defendant, and the judgment thus obtained is the one that this court is asked to hold conclusive, upon the ground that Mr. Fielding has had a full and fair opportunity to try the merits of his cause in a court where he was bound to appear. Such a judgment would not be held conclusive in England, and these English plaintiffs cannot justly complain of the application of their own law to themselves. *Abouloff* v. *Oppenheimer*, L. R. 10 Q. B. Div., 295.

III. The proof was insufficient to enable the court to render judgment in favor of the plaintiffs. But, aside from this, a judgment in favor of Fisher, Brown & Co., would not sustain a declaration setting forth a judgment in favor of Joseph. Bennett Clarke and John Edward H. Brown, even if they did in fact constitute the copartnership of Fisher, Brown & Co., in 1887 and 1888. In other words, a copartnership judgment cannot be enlarged by an action of debt thereon, into a judgment in favor of the individual members of that copartnership. This was a correct claim, and should have been sustained. 2 Freeman on Judgments (4th Ed.), 456.

*Henry G. Newton* and *Livingston W. Cleaveland*, for the appellees (plaintiffs).

I. The allegations of the complaint were sufficient, and the defendant's demurrer was properly overruled. The complaint followed the Form No. 169, p. 107, of the Practice Act Book. This should be conclusive. Although the form itself refers to a court in the State of Massachusetts, the title shows it to be applicable in a suit on any foreign judgment. Again, Form 100, page 216, of an answer asserting the "Invalidity of a

*foreign* judgment," expressly alleges that: (*a*) No process was served upon the defendant in the action resulting in the judgment mentioned in the complaint. (*b*) He never appeared in person or by attorney in said action. If these defenses could be raised by demurrer, they would not have been set up in these forms by way of answer. The forms under the Practice Act clearly establish the sufficiency of the complaint. See also 2 Sw. Dig. 494 ; *Hatch* v. *Spofford,* 22 Conn., 501 ; *Gunn* v. *Peakes,* 36 Minn., 177, and citing numerous cases ; 2 Black on Judgments, § 835 ; *Horton* v. *Critchfield,* 18 Ill., 133 ; *Robertson* v. *Struth,* 5 Ad. & El. N. S., 941 ; Van Fleet on Collateral Attack, 919 ; *Phelps* v. *Duffy,* 11 Nev. 80 ; Freeman on Judgments, § 453 ; *Bruckmann* v. *Taussig,* 7 Colo., 561 ; *Crake* v. *Crake,* 18 Ind., 156, 157 ; *Lathrop* v. *Stuart,* 5 McLean, 167.

II. The essence of the second defense seems to be that plaintiffs knew the defendant was not indebted to them, and brought the suit to embarrass and impede him, and obtain an unjust and unfair advantage over him. This, apparently, is an attempt to bring the case within *Stanton* v. *Embry,* 46 Conn., 66. In that case the defendants had no reason to suppose that plaintiff would endeavor to take judgment for more than the amount actually due. In the present case the defendant was served with a bill of particulars, showing the precise ,amount which plaintiff claimed to recover, and he defaulted the case, knowing the precise sum for which judgment would be rendered against him. There was no accident, no mistake, no surprise. All the cases of relief against judgments where the court had jurisdiction, contain some deceit practiced upon the defendant. *U. S.* v. *Throckmorton,* 98 U. S., 64, 65 ; *Pearce* v. *Olney,* 20 Conn., 555 ; *Moffatt* v. *U. S.,* 112 U. S., 24, 32 ; *Vance* v. *Burbank,* 101 id., 514, 519 ; *Green* v. *Green,* 2 Gray, 361 ; *Price* v. *Devhurst,* 8 Sim., 279. " Although it may be shown that a foreign judgment was fradulently obtained, yet it cannot be shown that the contract sued upon was procured by fraud." *Bank of Australasia* v. *Nias,* 16 Ad. & El. N. S., 717. " If, in any case, the plea of fraud is admissible in an action on the judgment of a sister State, it must be fraud practiced in

the very procurement of the judgment, not fraud anterior to it." 2 Black on Judgments, §§ 921, id., 544; Bigelow on Estoppel, 5th Ed., 307; *Ward* v. *Quinlivan*, 57 Mo., 425. That a judgment can only be attacked for fraud in its procurement, is very fully set forth in *Hilton* v. *Guyot*, 42 Fed. Rep., 249. See also 1 Swift's Digest, *753, 2 id., *138; Van Fleet on Collateral Attack, §§ 558, 586. The question is not whether there is ground for the interposition of a court of equity, but whether, as a matter of law, the defendant may prove to the jury the allegations of his second, third and fourth defenses. Nothing is alleged which might not as well have been made a defense in the action in England, and he was not prevented by any fraud or trick from making such defense there.

The third defense is a simple allegation that defendant was not indebted to the plaintiff. Apparently this defense is based on the obsolete doctrine that judgments of foreign courts are only *prima facie* evidence of indebtedness. That foreign judgments are conclusive, and that *nil debet* cannot be pleaded to them, has long been practically settled. *Hatch* v. *Spofford*, 22 Conn., 500; *Wood* v. *Watkinson*, 17 id., 504, 506; 1 Swift's Digest, *753, 754; *Dunstan* v. *Higgins*, 138 N. Y., 70; *Bank of Australasia* v. *Nias*, 16 Ad. & El. N. S. 729; *Trafford* v. *Blanc*, L. R. 36 Ch. Div., 600; *Glass* v. *Blackwell*, 48 Ark., 50; *Ferguson* v. *Oliver*, 99 Mich., 161, 58 N. W. Reporter, 43; *Baker* v. *Palmer*, 83 Ill., 568; *Lazier* v. *Westcott*, 26 N. Y., 146; *Silver Lake Bank* v. *Harding*, 5 Ohio, 545; Van Fleet on Collateral Attack, §§ 848–851; 2 Black on Judgments, §§ 825–829.

The foreign judgment although rendered on default, is equally conclusive. *Hart* v. *Granger*, 1 Conn., 154; *Bishop* v. *Vose*, 27 id., 1; *Hatch* v. *Spofford*, *Wood* v. *Watkinson*, supra; *Bradford* v. *Bradford*, 5 Conn., 131; *Pearce* v. *Olney*, 20 id., 555. From the above cases it is clear that such service as was made upon the defendant in England would, if made in this State, be sufficient to establish a judgment here. Surely our courts will acknowledge the validity in England of the practice which we have adopted here.

III. The fourth reason of appeal is the overruling of the objections to the record of the judgment. These objections were that the copy of judgment named Fisher, Brown & Co. and did not name Joseph Bennett Clark and John Edward H. Brown, and that it did not disclose whether Fisher, Brown & Co. was a copartnership or an individual, and, if a copartnership, did not give the names of the partners.

It is sufficiently evident from the judgment that Fisher, Brown & Co. was a partnership. Fisher, Brown & Co. are described as plaintiffs, and in the body of the judgment they are spoken of as plaintiffs. An individual or corporation would have been plaintiff, not plaintiffs. The name Fisher, Brown & Co. is apparently a partnership name, and in the absence of some allegation to the contrary, it must be presumed to be a partnership name. It is presumed that when a judgment is rendered, everything necessary to the validity of the judgment has been correctly done. Freeman on Judgments, §§ 452, 453 ; *Lathrop* v. *Stuart*, 6 McLean, 167 ; *Wright* v. *Fire Ins. Asso. of London*, 19 L. R. A. 215 ; *Smith* v. *Chenault*, 48 Texas, 455 ; *Lafayette Insurance Co.* v. *French*, 18 Howard, 404 ; Van Fleet on Collateral Attack, § 857. .

IV. Defendant's fifth reason of appeal is the overruling of his claim that it could not be shown by testimony that Fisher, Brown & Co. was a partnership, and that the plaintiffs constituted that partnership. No question is made but that the law of England as to bringing suits and taking judgments in the name of a partnership may be thus proved, and is correctly stated. No reason is given why the statutory requirements as to the names of the partners in Connecticut should be made a condition of enforcing English judgments, and we have heard of no authority for such a proposition.

BALDWIN, J. The plaintiffs' complaint was drawn in the form authorized by the Practice Book (No. 169, p. 107) in actions on a foreign judgment. In actions on a domestic judgment, the authorized forms (Practice Book, No. 166 and No. 167, pp. 106, 107) state the fact, but not the manner of

its recovery; but in declaring on the judgment of a foreign court, the approved averment is that such court, " in an action therein pending between the plaintiffs and the defendant, duly adjudged that the defendant should pay to the plaintiffs " the sum in question. No court can " duly " adjudge such a payment, except in an action conducted in due course of law. Due course or process of law, with respect to such a judicial proceeding, necessarily involves reasonable notice to the defendant of the institution and nature of the action, given (unless this be waived), if he be a non-resident, by personal service within the jurisdiction, and a fair opportunity to be heard before a tribunal of competent jurisdiction. So much is due to every person from whom another seeks to recover in a judicial controversy before a court of justice. *Pennoyer* v. *Neff*, 95 U. S. 714, 733.

In the case of a domestic judgment, it is unnecessary to allege that these conditions have been fulfilled, because our law requires it, and it is to be presumed that the law has been obeyed. In respect to a foreign judgment, nothing can safely be taken for granted, and the Practice Book has therefore provided a different form of complaint.

The Practice Act was designed to simplify our legal procedure, and to abbreviate pleadings by the omission of all unnecessary allegations. The demurrer to the complaint, on the ground that it did not allege that the High Court of Justice, Queen's Bench Division, Birmingham District Registry, had jurisdiction of the action, or of the parties, or of the subject-matter, nor that the defendant had notice of its pendency, or was summoned to appear, was therefore properly overruled. These facts were the indispensable conditions of a due adjudication by the foreign court; and whatever is necessarily implied is sufficiently pleaded. Nor was it cause of demurrer that the complaint did not state that any hearing or trial was had. The averment as to a due adjudication implied that there was a fair opportunity for a hearing ; and the defendant could not complain that he did not avail himself of it.

Three special defenses were pleaded, and, on demurrer, held insufficient.

The second of these set up that the defendant was served with the process in the English action, while transiently stopping at a hotel in Birmingham, and when he was about to take his departure for home ; and that such service was so made and timed for the purpose of embarrassing him, and obtaining an unjust and unfair advantage, by preventing his having a fair opportunity to make his defense, unless he prolonged his stay abroad indefinitely.

The rights of sovereignty extend to all persons and things, not excepted by some special privilege, that are within the territory of the sovereign. An alien friend, however transient his presence may be, is entitled to a temporary protection, and owes in return a temporary allegiance. Story on the Conflict of Laws, §§ 18, 22, 541; *Carlisle* v. *U. S.*, 16 Wall., 147, 154.

The fact that the defendant was a foreigner, making but a brief stay in the country, and on the point of leaving it for his own, did not deprive the courts of England of all jurisdiction over him. The Roman maxim, *Actor sequitur forum rei*, if it has any force in English or American jurisprudence, operates as a permission, rather than a command. A man who is absent from his domicile can still be sued there ; but he can also be sued wherever he is found, if personally served with legal process within the jurisdiction where the plaintiff seeks his remedy. The action must be brought, indeed, in a court to which the defendant is subject, and subject at the time of suit; but, unless protected by treaty stipulation or official privilege, he is subject to every court within reach of whose process he may enter. The Roman law allowed a non-resident to be sued where he had established a temporary seat of business, and, in some cases, where he had simply contracted a single obligation. Dig. V, 1, *de judiciis, et ubi quisque agere vel conveniri debeat*, 2, 19, 24. The common law, so far as concerns the enforcement of a pecuniary liability, goes farther, and operates alike upon every private individual who may be found, however transiently, within the territory, where it is in force. Wharton on the Conflict of Laws, § 653. An English court will take cognizance of an action on a con-

tract wherever made and between whatever parties. Holland on Jurisprudence (5th Ed.), 349. So the courts of this State have always regarded transitory actions as following the person, and entertained them against foreigners found within our jurisdiction, whether brought by a foreigner or a citizen. *Place* v. *Lyon*, Kirb., 404, 406; *Potter* v. *Allin*, 2 Root, 63, 66, 67. "Territorial jurisdiction attaches (with special exceptions) upon all persons either permanently or temporarily resident within the territory while they are within it; but it does not follow them after they have withdrawn from it, and when they are living in another independent country." *Sirdar Gurdyal Singh* v. *Rajah of Faridkote*, L. R., Appeal Cases of 1894, 670, 683.

The several States of the United States are, as respects their relations to each other, excepting only such of these as are regulated by the Constitution of the United States, independent and foreign sovereignties. *Buckner* v. *Finley*, 2 Pet., 586, 590; *Pennoyer* v. *Neff*, 95 U. S., 714, 722. The effect in one of them of a suit brought or judgment rendered in another is precisely the same as if the latter were a foreign country, except so far as Art. IV, § 1, of the Constitution of the United States may have established a different rule. *Hatch* v. *Spofford*, 22 Conn., 485, 498; *M'Elmoyle* v. *Cohen*, 13 Pet., 312, 324; *Thompson* v. *Whitman*, 18 Wall., 457, 461. Notwithstanding that provision of the Constitution and the statute passed to enforce it (U. S. Rev. Stat., § 905), the jurisdiction of a State court whose judgment is brought in question in another State is always open to inquiry. In that respect, every State court is to be regarded as a foreign court. *Hall* v. *Lanning*, 91 U. S., 160, 165; *Grover & Baker Machine Co.* v. *Radcliffe*, 137 id., 287, 294, 298.

The courts of this State have never before had occasion to pass directly upon the defenses which may be open here to an action upon a judgment of a court of a foreign country, but they have often been called to consider the effect of legal proceedings instituted in one of the United States against a citizen of another; and the right to secure jurisdiction over a non-resident, who is served with process while

transiently in the State, has been uniformly upheld. *Hart* v. *Granger*, 1 Conn., 154, 165, 173; *Wood* v. *Watkinson*, 17 id., 500, 504; *Hatch* v. *Spofford*, 22 id., 485; *Bishop* v. *Vose*, 27 id., 1, 11, 12; *Duryee* v. *Hale*, 31 id., 217, 223; *Easterly* v. *Goodwin*, 35 id., 273, 278; *O'Sullivan* v. *Overton*, 56 id., 102, 103.

These decisions are based on what has been deemed an accepted principle of international law, applicable between the States, on no other ground than that they are, as to such a question, in the position of foreign nations to each other. *Grover & Baker Machine Co.* v. *Radcliffe*, 137 U. S., 287, 298; *Lazier* v. *Westcott*, 26 N. Y., 146, 154.

The English court having, then, jurisdiction of the parties, and presumably of the action, and the subject-matter, as to which no question has been made, there is nothing in the defense now pleaded that the suit was brought as it was and when it was, "for the purpose of embarrassing and impeding the defendant, and to prevent his having a fair opportunity to defend said suit unless he prolonged his stay indefinitely at said Birmingham, and thereby said plaintiff sought to obtain an unjust and unfair advantage over said defendant." Where there is a legal right to do a certain act, the motive which induces the exercise of the right is of no importance. *McCune* v. *Norwich City Gas Co.*, 30 Conn., 521, 524; *Occum Company* v. *Sprague Mfg. Co.*, 34 id., 529, 540. *Nullus videtur dolo facere, qui suo jure utitur.* The act complained of having been fully stated, and being one which the law permitted, whatever advantage it gave the plaintiffs could be neither unjust nor unfair, and these epithets are therefore of no effect. *Middletown* v. *Boston & New York Air Line R. R. Co.*, 53 Conn., 351, 359. They had the right to sue the defendant where they found him, or at his domicil in Connecticut, and in the choice of the forum were free to consult their own convenience, without regard to any loss he might sustain from "the law's delays." *Lovell* v. *Hammond Co.*, 66 Conn., 500, 512.

The demurrer to the second defense also admitted that the defendant when served with the process of the foreign court,

was president of the National Wire Mattress Company, a Connecticut corporation, and " was in nowise 'indebted to the plaintiffs in said suit, all of which was well known to said plaintiffs, but any claim that they had or may have had in which the defendant was in any way interested was a claim against said National Wire Mattress Company, all which was well known to said plaintiffs."

By this, and by the third defense, is raised the question as to how far a foreign judgment for a sum of money, rendered against one of our citizens by a competent tribunal, acting within its jurisdiction, should be held conclusive in a suit brought here for its collection.

It is the settled rule in England, that in an action instituted there on a foreign judgment, rendered by a court of competent jurisdiction, the proceedings before which were not so conducted as to be clearly contrary to natural justice, the defendant cannot be allowed to go into the merits of the original cause of action, which were tried in the foreign court, unless it be necessary in order to support a claim that the judgment was procured by fraud. In such case, the merits may be re-tried, not to show that the foreign court came to a wrong conclusion, but that it was fraudulently misled into coming to a wrong conclusion. If the triers are convinced that the foreign judgment should have been rendered, on the merits, the other way, but still do not find that there was fraud, the defense fails. *Abouloff* v. *Oppenheimer*, L. R., 10 Q. B. D., 295, 302; *Vadala* v. *Lawes*, L. R., 25 Q. B. D., 310, 316, 319.

JUDGE STORY, in his work on the Conflict of Laws, concludes a discussion of this subject, which is referred to in terms of commendation by this court in *Hatch* v. *Spofford*, 22 Conn., 501, with the remark that the principle of reciprocity may not improperly be applied, and foreign judgments treated as conclusive in any country, if rendered in another where like effect is conceded to judgments of the courts of the former. " This," he observes, " is certainly a very reasonable rule; and may, perhaps, hereafter work itself firmly

into the structure of international jurisprudence." Story on the Conflict of Laws, § 618.

What is termed the comity of nations is the formal expression and ultimate result of that mutual respect accorded throughout the civilized world by the representatives of each sovereign power to those of every other, in considering the effects of their official acts. Its source is a sentiment of reciprocal regard, founded on identity of position and similarity of institutions.

The effect to be given to a foreign judgment *in personam*, for a money demand, must be determined either by the comity of nations, the rule of absolute reciprocity, or the personal obligation resting upon the defendant. *Hilton* v. *Guyot*, 159 U. S., 113.

Whichever test may be adopted, the result would be the same where the question arises between the courts of England and those of an American State which was once an English colony. They are engaged in administering the same system of jurisprudence, and are bound together by common institutions and modes of thought, no less than by sharing the same language and the same history. The close and extensive commercial intercourse also between the United States and England, and across the long Canadian frontier, makes it especially important that the many controversies to which it must give rise should be promptly brought to a final settlement. When an American voluntarily places himself on English soil, he comes under a local and temporary allegiance to its sovereign which makes it his duty to respect any summons with which he may there be served, to appear before the courts of the country.

The process served upon the defendant gave him full notice of the character and items of the plaintiffs' claim. He was bound either to enter an appearance or submit to the consequences of a default. He put himself under the power of the court, the moment he entered the territory which was subject to its authority. Nor did he put himself under its power, simply in the sense that it could issue process and render judgment against him, which would be of force within

the limits of that territory. To that extent its judgments might be valid, though rendered without any personal service, upon a simple attachment of goods or by publication. But they would be mere expressions of the will of the sovereign, and impose no personal obligation which other sovereigns could recognize or enforce. *Bischoff* v. *Wethered*, 9 Wall., 812. Judgments rendered against a foreigner who is personally served when personally present, stand on a ground wholly different. These and these only, so far as actions for money damages are concerned, are entitled to full respect in the courts of other countries, by the principles of international law. As between the United States and Great Britain, it may be fairly assumed that every citizen of either, while within the territory of the other, assents to the jurisdiction of its courts of justice over all pecuniary controversies to which he may be duly made a party before them.

This doctrine, that presence confers jurisdiction, may not be one recognized in Roman law or the modern civil law. Dig. XLII., 1, *de re judicata etc.*, 53 ; Story on the Conflict of Laws, §§ 611–617 ; Wharton on the Conflict of Laws, § 653 ; Mourlon's Répétitions Écrites sur le Code Civil, Tom. III., § 1469. The Romans viewed law as personal rather than territorial in its operation. The traveler carried with him the shield of his own law ; and on the same territory there might be, even for its permanent inhabitants, two systems of jurisprudence of equal force, each governing a different race. Such principles of government find no place in the common law of England and of Connecticut. With us the law of the land protects all who stand upon it, and whenever a right has been violated, gives a remedy, without regard to the nationality of the offender.

In our opinion, the Queen's Bench Division of the High Court of Justice had full jurisdiction to decide the original controversy between the parties to this action. The defendant accepted the forum, when he voluntarily placed himself on English soil, and so came under an implied obligation to respect such legal process as might be served upon him there, to the extent of satisfying any resulting judgment, duly ren-

dered for a pecuniary demand.   The law raises this obligation
because the interests of human society require it; and it is
not escaped by departing from one country into another, ex-
cept so far as a judicial sanction may be withheld because
reciprocity is refused.   The maxim, *Interest reipublicœ ut sit
finis litium,* is not restricted in its application to controver-
sies or suits originating in the State before whose courts it is
invoked.   It does not rest on the excellence of any particu-
lar system of jurisprudence.   It governs wherever the parties
come, in the last resort, before a court constituted under an
orderly establishment of legal procedure.   No one who has
been or could have been heard upon a disputed claim, in a
cause to which he was duly made a party, pending before a
competent judicial tribunal, having jurisdiction over him,
proceeding in due course of justice, and not misled by the
fraud of the other party, should be allowed, after a final judg-
ment has been pronounced, to renew the contest in another
country.   The object of courts is hardly less to put an end
to controversies, than to decide them justly.

The defenses in question do not, in terms, charge the plain-
tiffs with fraud.   The averments that they well knew, when
they brought their suit, that the defendant was in no wise
indebted to them, and that the only claim they had or might
have, in which he was in any way interested, was one against
the corporation of which he was an officer, do not, standing
alone, import that they attempted to impose and did impose
upon the court.   Fraud is never presumed.   The claim against
the corporation may have been such that the defendant could
be held collaterally liable upon it, although it remained the
debt of the corporation, only.   It may have been contracted
by him in behalf of the corporation, but without its authority.
It may have arisen from a transaction that was *ultra vires,*
but which he had falsely represented to be within its powers.

If he was in no way liable to the plaintiffs, the place to
show it was in the English court.   A state of facts quite simi-
lar to that here alleged was set up and established by proof,
in one of the leading cases in our reports.   A citizen and resi-
dent of Connecticut, while transiently in New York, was

served with process from one of her courts, in an action based upon a contract made by the plaintiff with a Connecticut corporation, but which, in his declaration, he had, as the defendant asserted, "falsely assumed" to have been made by the latter personally, and on his own personal credit. The defendant entered no appearance, and judgment by default was rendered against him, for the sum demanded, to collect which suit was instituted against him here. He thereupon brought a bill in equity for an injunction, and in addition to what has been already stated, alleged and proved that the plaintiff's attorney assured him, after the service of the process, that a mistake had been made in suing him individually instead of the corporation, and thereupon agreed that nothing further should be done in relation to the action, without previous notice to him; in consequence of which assurance he had omitted to enter an appearance. The injunction was granted on this last ground; but that founded on the false averments in the declaration in the New York suit was rejected as untenable, in these words: "A suit was commenced in New York, against the present plaintiff, by virtue of which, and of the process thereon, he was arrested, and such proceedings were had, that a judgment for about six hundred dollars was obtained against him, on a cause of action founded wholly on a contract, with which, personally, he had nothing to do; but which was entered into by him, as the agent of the Norwich Foundry Company, a corporation with which the plaintiff in that suit had had previous dealings, and was well known to him, at the time, as the party with whom he was contracting. If this was all, the plaintiff would have no remedy, however unjust it might be, to compel him to pay that judgment. Still, as he was duly served with process in that suit, it was his duty to make defense in it; and an injunction ought not to be granted to relieve him from the consequences of his own neglect." *Pearce* v. *Olney*, 20 Conn., 544, 555 ; *Embry* v. *Palmer*, 107 U. S., 3, 12, 13.

The doctrine of *Pearce* v. *Olney* is not less applicable to the case at bar because the judgment in question there was one of a sister State, while here it emanates from the court

of a foreign country. It is true that fraud in procuring it is no defense at law to an action on a judgment of the former description. *Christmas* v. *Russell*, 5 Wall., 290. It is, however, an equitable bar to its enforcement, just as it is in case of a domestic judgment. A judgment may be good at law, and yet equity may deem it against conscience for the plaintiff to stand upon his legal rights. In such a case it is because the judgment is good at law that equitable relief is granted.

In *Pearce* v. *Olney*, these principles governed the decision. An injunction was granted on account of a fraud as to a matter which could not have been put in issue in the New York suit. An injunction was refused, on account of a fraud as to a matter which could have been put in issue in the New York suit. In the case at bar, by the force of the Practice Act, equitable defenses could be pleaded by way of answer, but the defendant had no equity, because the question of his indebtedness to the plaintiffs, if it was to be contested, should have been put in issue before the English court. *Bank of Australasia* v. *Nias*, 16 Ad. & El. (N. S.), 735, 4 Eng. Law & Eq., 252.

Nor did the case of *Pearce* v. *Olney* rest on any special duty of a citizen of one of the United States, as such, to submit himself to the jurisdiction of a court of another State, before which he may be duly summoned. The conclusiveness of a judgment rendered in one State, when relied on in another, is in no manner dependent on the citizenship of the parties to it. It has equal weight whether they are Americans or foreigners. The Constitution of the United States secures to the citizens of each of them certain privileges and immunities as respects every other State, but it imposes upon them no particular duties in return. It places the citizen of one State, who enters the territory of another, no more under the power of its courts, than if he were an alien visitor. See *Bonaparte* v. *Tax Court*, 104 U. S., 592, 595.

It follows that the judgment in suit was conclusive as to the merits of the cause of action, and that the several special

defenses, so far as they sought a re-trial of them, were properly overruled. The defendant had already had his day in court.

The present action was brought by two individuals, described as partners doing business under the firm name of Fisher, Brown & Company, and the English judgment was alleged in the complaint to have been recovered by "the plaintiffs," on April 3d, 1889. Upon the trial of the issue closed upon the first defense, they offered in evidence a copy of the record in the English suit, in which the plaintiffs were named throughout simply as Fisher, Brown & Company. They also offered at the same time certain depositions tending to prove that the plaintiffs constituted, during the whole of the year 1889, the copartnership of Fisher, Brown & Company, and as such recovered the judgment in question; and that by the laws and rules of court in England, any persons claiming as copartners could sue in the name of the firm of which they were members at the time of the accruing of the cause of action. The defendant objected to all this evidence, on the ground that the record offered varied from that alleged, and did not show whether Fisher, Brown & Company was a corporation or copartnership, or, if a copartnership, that the plaintiffs were members of it, and could not be helped out by parol; and also claimed that the depositions did not show that the plaintiffs were members of such a firm when the original cause of action arose.

The court committed no error in overruling these objections and claims, and admitting the evidence. The law and practice determining the form of judicial proceedings in a foreign court may always be shown, and shown by parol. The testimony that the plaintiffs were the members of a firm styled Fisher, Brown & Company throughout 1889, and as such recovered the judgment in suit, gave an intelligible meaning to the words Fisher, Brown & Company, as used in the record of the High Court of Justice, and in connection with it tended to show that they were also copartners when the cause of action accrued; for else they could not have been entitled to such a judgment, under the rules governing suits by copartners in the copartnership name. Wherever a judg-

ment on a partnership demand can lawfully be given in favor of the copartnership, without stating the names of the copartners, it is, in effect, a judgment in favor of such copartners, described by their copartnership name, and may properly be declared on as such, in any proceedings subsequently brought to enforce it. This is merely describing it according to its legal effect.

The defendant admitted that he was the person against whom the English judgment was rendered, but put the plaintiffs on proof that they were the parties by whom it was recovered. Extrinsic evidence of this was therefore required, and the depositions were clearly admissible to identify particular individuals as those to whom the description of the judgment creditors in the record, by a partnership name, properly applied.

There is no error in the judgment appealed from.

In this opinion ANDREWS, C. J., TORRANCE and FENN, Js., concurred.

HAMERSLEY, J. The action on a foreign judgment is an action at common law sanctioning an obligation legal by force of the common law. Our law on this subject depends on the common law of England as it stood at the date of our independence. The authority which lies at the foundation of that law is *Sinclair* v. *Fraser*, decided by the House of Lords in 1771. The judgment creditor sued his debtor in Scotland. The Court of Sessions refused to give any effect to the foreign judgment, and held the party bound to prove the nature and extent of his demand. The House of Lords, upon appeal, reversed this decision, upon the ground as stated in the order of reversal, " that the judgment of the Court of Jamaica ought to be received as evidence *prima facie*, of the debt, and that it lies on the defendant to impeach the justice thereof, or to shew the same to have been irregularly or unduly obtained." 20 How. St. Tr., 468, 469.

In *Walker* v. *Witter*, Doug. 1, decided in 1778, it was held that an action of debt would lie for the collection of a foreign

judgment, because *indebitatus assumpsit* would lie; but in a declaration in debt, the plea of *nul tiel* record was bad, because the action was not on a specialty, but for recovery of a simple contract debt; and LORD MANSFIELD said that the doctrine of *Sinclair* v. *Fraser* was unquestionable. "Foreign judgments are a ground of action everywhere, but they are examinable." And ASHURST, J., indicates the ground of the right, when he says, "in *indebitatus assumpsit* on a foreign judgment, the judgment is shewn as a *consideration.*"

In *Galbraith* v. *Neville*, decided about 1781, Doug., 6, note, there was apparently an attempt to set up a defense on the ground that the foreign judgment offered in evidence was wrongly decided on the merits, and BULLER, J., expressed an opinion based on his understanding of a reported saying of LORD HARDWICKE, that the foreign judgment was not conclusive upon the merits of the questions actually adjudicated; while LORD KENYON took a different view; but the case was decided in favor of the judgment, as all the judges were of opinion that no evidence had been adduced to impeach it.

In *Philips* v. *Hunter*, 2 H. Bl., 402, 410 (1795), a dictum of CH. J. EYRE supports the suggestion of ASHURST, J., in *Walker* v. *Witter*, and asserts that as a ground of action a foreign judgment is treated " not as conclusive, but as matter *in pais*, as consideration *prima facie* sufficient to raise a promise; we examine it, as we do all other considerations of promises, and for that purpose we receive evidence of what the law of the foreign State is, and whether the judgment is warranted by that law. In all other cases, we give entire faith and credit to the sentences of foreign courts, and consider them as conclusive."

And the suggestion of ASHURST, J., is further supported by BEST, CH. J., in *Arnott* v. *Redfern*, 3 Bing., 353, 357, (1826). He says: "It has been decided by the highest authority in the case of *Sinclair* v. *Fraser*, 'that foreign judgments are *prima facie* evidence of a debt, although it is competent to the defendant to impeach the justice of them, or to

shew that they are irregularly or unduly obtained.' This is
founded on a plain and obvious principle of natural justice."

The common law, as established by *Sinclair* v. *Fraser* and
*Walker* v. *Witter*, is the law adopted by this State. 1 Swift's
Digest, 573; *Aldrich* v. *Kinney*, 4 Conn., 380, 382. The same
law has generally been adopted by other States as their com-
mon law. *Bissell* v. *Briggs*, 9 Mass., 462; *Taylor* v. *Phelps*,
1 Har. & G. (Md.), 492; *Mills* v. *Duryee*, 7 Cranch., 481;
*Burnham* v. *Webster*, 1 Woodb. & M., 172; *Christmas* v.
*Russell*, 5 Wall., 290, 304.

This law declares that when a judgment is rendered by a
foreign court, that fact may be the source of a legal obliga-
tion between the parties to such judgment, which can be en-
forced in our courts through the ancient form of an action on
the case. But beyond this the law is not clear. The nature
and ground of such obligation is not defined. The defenses
to such action are not settled. In respect to these matters,
in this State, and generally with American courts, the field is
an open one,—not to make law by arbitrarily recognizing
or rejecting a defense, but to declare the law resulting from
established principles.

In the present case the second defense alleges sufficiently
for the purpose of this decision, that the judgment was ren-
dered by a court of Great Britain upon default of appear-
ance; that the defendant is a citizen of the United States,
never a subject of the Queen nor resident within her domin-
ions; that he was served with the notice to appear while casu-
ally in England and on the eve of departure; that he was
absent from the Kingdom at the time he was required to ap-
pear, and during all subsequent proceedings; that the cause
of action on which the notice to appear in court was based,
did not arise in England, and did not concern any conduct,
act or contract of the defendant, done or entered into within
the dominions of the Queen. This defense was held insuffi-
cient by the trial court; and my associates reach the conclu-
sion that such facts do not constitute a good defense to the
action. I must dissent from that conclusion.

I believe it cannot be supported, except on the theory that

our courts have at common law the power to authorize the execution of the will of a foreign sovereign signified in a judgment; and to set the conditions on which such execution will be granted. I believe such theory to be inconsistent with established principles of common law; that the power of authorizing such execution of the will of a foreign sovereign belongs, not to the judicial, but to the executive or legislative department; and that it would be against public policy to exercise the power under such conditions as exist in this case, even if it were vested in the court.

A defense cannot be intelligently passed upon, unless the nature of the obligation it is claimed to negative is clearly defined. What is this common law obligation whose violation was originally enforced by the common law action on the case? It clearly does not arise from a tort; nor does it arise from a contract. Although a judgment is sometimes spoken of as in the nature of a contract, such language must be confined to certain analogies not affecting the essential character of a judgment. *Rae* v. *Hulbert*, 17 Ill., 572; *Todd* v. *Crumb*, 5 McLean, 172; *Wyman* v. *Mitchell*, 1 Cow., 316, 320; *Kramer* v. *Rebman*, 9 Iowa, 114, 117. When the clause in the Federal Constitution prohibiting States from passing any law impairing the obligation of a contract, was appealed to as protecting judgments, the appeal was denied by the United States Supreme Court, on the ground that a judgment is in no sense a contract or agreement between the parties, even when founded upon a contract; citing LORD MANSFIELD in *Bidleson* v. *Whytel*, 3 Burr., 1545: " A judgment is no contract, nor can be considered in the light of a contract: for *judicium redditur in invitum.*" *Morley* v. *Lake Shore Ry. Co.*, 146 U. S., 162, 169. An obligation which is neither *ex contractu* nor *ex delicto*, must spring from the relation of the parties to some event under such circumstances that a legal duty arises. Our common law obligation, therefore, belongs to those miscellaneous obligations arising from facts which are not conventions nor yet wrongs, but nevertheless are causes of obligations, which for want of a better name are classed as *quasi-contracts*. The principal fact from which the

obligation arises, is a rendition of final judgment by a foreign municipal court, and the main difficulty in defining that obligation is found in the particular character of a judgment, which is not only a fact that may, in connection with other facts, raise an obligation between the parties, transitory in its nature and so cognizable in our courts; but is also an act of the foreign sovereign imposing an obligation of obedience which, as such, can only be put in execution within the territory subject to that sovereign. This double aspect of a judgment is distinctly recognized and established in our common law, although it has been obscured by using in some cases the form of an action to put in execution a domestic judgment. So our first step towards ascertaining the nature of the common law obligation which may arise between the parties to a foreign judgment, is to make clear this distinction established by our law between that obligation and the obligation of obedience imposed by a domestic judgment and sometimes enforced through the form of an action.

The final judgment of a court of competent jurisdiction puts an end to all further litigation between the parties in respect to the specific cause of action adjudicated between them and decided and settled by the judgment; and the original obligation which the action was brought to enforce no longer exists. Gaius notes the application of such rule in the early Roman law. " *Tollitur adhuc obligatio litis contestatione, si modo ligitimo judicio fuerit actum.*" Gai., III., § 180 (see also § 181). And Austin demonstrates that the extinction of the original cause of action by the rendition of final judgment, results from fundamental principles of jurisprudence; the obligation has been violated, the right of action arising from that violation has been exercised, and the sanction prescribed by law has been administered. Austin on Juris., *passim.* Such judgment, therefore, is a declaration of the sovereign, through his court, that a legal obligation has been violated, and is a final determination of the penalty imposed by him for that violation. This result is commonly, and perhaps somewhat inaccurately, expressed by the phrase, " the original right of action is merged in the judgment."

But this act of the sovereign not only satisfies and puts an end to the original obligation, it also imposes a new obligation on the subject of the judgment, and this obligation implies a corresponding right in the person to whom the subject of the judgment is commanded to pay its amount. Such corresponding right is a right to the execution of the command by which it was created; and the remedy given by our law is the execution, or process by which the property of the delinquent may be distrained, or his person imprisoned until the obligation is satisfied. This remedy may be granted on application, as in the case of a *capias*, or after notice to the delinquent, as in the case of a *scire facias*. A remedy is also given by means of the action of debt on judgment; as now permitted, this remedy is an anomalous proceeding. BLACKSTONE says: " This method seems to have been invented, when *real* actions were more in use than at present, and damages were permitted to be recovered thereon; in order to have the benefit of a writ of *capias* to take the defendant's body in execution for those damages, which process was allowable in an action of debt (in consequence of the statute 25 Edw. III., c. 17) but not in an action real. Wherefore, since the disuse of those real actions, actions of debt upon judgment in personal suits have been pretty much discountenanced by the courts, as being generally vexatious and oppressive, by harassing the defendant with the costs of two actions instead of one." 3 Bla. Com., 159, 160. COKE says that the remedy was provided by common law, as the only method (prior to the Statute of Westminster 2, authorizing a writ of *scire facias* for that purpose) of reviving a judgment dormant by reason of the failure to sue out a writ of execution within a year and a day, and of obtaining execution thereon. Coke, Litt., § 290.

Whether the remedy was originally " invented " to provide a more effective writ of execution in a peculiar action, or as a means of reviving a dormant judgment so that execution might issue after the time fixed by law for its issue had expired, it is certain that its purpose was to provide a method of obtaining execution of the original judgment in

cases where the law regulating the issue of execution was defective. The use of the action of debt on judgment, when the remedy by execution is complete, which was occasionally permitted at common law, is therefore anomalous; it was discouraged by the courts, and by statute (44 Geo. 3,) costs were not allowed on such action, unless by special order of court. The Court of King's Bench, taking advantage of an Act reconstituting the county courts and making some cumulative provisions as to the issue of executions, held that the Act, by making new provisions, restricted the remedy to the writ of execution, and that debt on the judgment of a county court would not lie. The motive of the decision is indicated in the expression of CAMPELL, C. J.; "I rejoice that we are able to come to this conclusion by the established rules of law; for there can be no doubt that it is most desirable that such actions should not lie." *Berkeley* v. *Elderkin*, 1 El. & Bl., 805, 809, (1853). This decision was followed the same year by the Court of Exchequer. *Austin* v. *Mills*, 9 Ex., 288.

In this State the right of a judgment creditor to execution, was not limited to a year and a day after the judgment was entered, and the English common law permitting an action of debt on judgment when the remedy by *capias* was adequate, was not regarded as adopted in this particular. The common understanding of the profession and the weight of authority, so far as the question had been before the courts, was stated by JUDGE SWIFT in his Digest, Vol. 1, p. 573, (original edition) : "In this State, an execution can be prayed out at any time during the life of the parties, and debt on judgment is not sustainable, unless one of the parties is dead, or some new object is to be obtained." But in 1822, in the case of *Denison* v. *Williams*, 4 Conn., 402, a majority of the court held that the English common law, in this particular, must be regarded as in force here.

We find, therefore, that a domestic judgment is an exercise of the power of the State over its citizens by which the obligation sought to be enforced in the action resulting in the judgment ceases to exist, and a new obligation to pay the

amount of the judgment is imposed.   This latter obligation,
unlike one arising from the agreement of parties between
themselves, is not transitory ; the rule " *debitum et contrac-*
*tus sunt nullius loci* " (1 Saund., 74) does not apply.   The
obligation or debt created by the act of the State is enforceable
by the State only within its own limits.   " Judgment creates
a debt all over the kingdom."  Gilbert, Debt, 392.   The ap-
propriate remedy given to one holding the right correspond-
ing to this obligation, is not by action calling for judicial
adjudication, but by writ of execution ; this writ is granted
on application or after notice, and when such remedy is de-
fective a peculiar action is authorized whereby the right to
execution may be made effective ; and by an anomaly in the
law, this action may lie when the reasons for its use do not
exist.   But under all circumstances such action is, in its es-
sential characteristics, not an adjudication between the par-
ties in any ordinary sense of the word, but simply a method
of verifying the command of the State signified in the judg-
ment, and of enforcing by writ of execution that command.
*Williams* v. *Cable*, 7 Conn., 119.

It follows that the obligation arising from a domestic
judgment enforceable in our courts, differs materially from
any ordinary obligation arising from the acts of the parties,
whether *ex contractu* or *quasi ex contractu ;* that it is imposed
directly by the State, and is an obligation of obedience, not
simply of the law in general, but of this particular command ;
and that the corresponding right is a right to the process of
the State for the execution of the judgment.   The fact that
an action of debt may be resorted to, instead of a *capias* or
*scire facias* to obtain execution of the judgment, does not
affect its essential nature.   " The form of procedure cannot
change their (its) character."   *Meriwether* v. *Garrett*, 102
U. S. 514.

It also follows that this peculiar obligation of obedience,
*ex vi termini*, has no existence beyond the limits of the State
which imposed it.   That these conclusions are settled by the
common law, cannot be questioned.   When a foreign State
has ascertained the violation of any obligation between par-

ties, and by judgment of its court has put an end to the obligation whose violation is thus ascertained, and fixed its punishment, creating a new obligation to obey the command of the State by submission to that penalty—our law is settled that such an exercise of sovereign power cannot operate beyond the limits of the State where the judgment is rendered. This principle is commonly expressed by the saying, "the original cause of action is not merged in a foreign judgment." It is true the judgment may be shown as a fact which, under our law, may be material in establishing the allegations of plaintiff or defendant (a subject which will be considered directly), but the act of the foreign sovereign in putting an end to the obligation has no force within our territory, and the original obligation remains subject to the adjudication of our courts as truly as if the judgment had not been rendered. This is in accordance with well recognized principles of international law. "Since a judgment is merely an act of sovereign power, it can of itself have no extra-territorial effect. The officers of the State in which it is pronounced must carry it into execution, whether with or without the intervention of any farther formalities, but it can convey no authority to the officers of another State." Westlake, Int. Law, *361; Story's Confl. of Laws, 278; and is thoroughly established as our municipal law. Bigelow on Estoppel, 246; *Smith* v. *Nicolls*, 7 Scott, 147; *Hall* v. *Odber*, 11 East, 118, 124; *Wood* v. *Gamble*, 11 Cush., 8; *Bank of Australasia* v. *Harding*, 19 L. J. C. P., 345; 2 Smith's L. C., *702. And the law is so clear that the action to recover the amount of a foreign judgment is an action concurrent with that on the original cause of action, that the forms given in Chitty's Pleading for an action on the judgment all contain the instruction, "Add counts for the original debt;" and the practice of trying the right in the original cause of action, as well as the right to the amount of the judgment in the same proceeding, has always prevailed, and continues under the new method of procedure in England, so that a verdict may be given on both issues.

And herein is found the radical distinction between the

obligation of obedience imposed by a domestic judgment, (and by a foreign judgment within the territory of the foreign sovereign) and the common law obligation which may arise between the parties to a foreign judgment. The latter cannot involve the right to the execution of the judgment; it must be consistent with the continued existence of the original cause of action; it cannot depend on the mere rendition of the judgment, but requires certain relations of the parties to the fact of the judgment, which may not exist in respect to every such judgment.

Our next step in ascertaining the nature of this common law obligation is to fully recognize the established principle that such obligation must depend upon the municipal law, and cannot result from any rule of international law, nor yet from the application of any so-called rule of "comity." It is unnecessary to repeat or extend the argument which demonstrates that by international law a judgment has no force beyond the territory of the State where it is rendered. It cannot be executed in a foreign State unless by authority of that State. No rule of international law requires the exercise of such authority. In fact it has been exercised absolutely by no nation. It is rarely exercised at all, except by force of an express treaty or the implied treaty of reciprocity, and then only upon conditions fixed by the laws of the nation where execution is sought. There being no international law in respect to the execution of foreign judgments, it is certain that the common law obligation arising from the relation of parties to the fact of such judgment, cannot be the result of any rule of international law. I believe, indeed, there is no nation, unless possibly Denmark, whose municipal law recognizes (as our common law does) as legal and enforceable by action in its courts, any obligation arising between the parties to pay the amount of a foreign judgment. Such obligation—as distinguished from the obligation of a subject to obey the specific command of his sovereign— is pecular to the English common law, and depends wholly upon our municipal law.

It is equally clear that such obligation cannot result from

any rule of comity of nations, so called. Such "comity" implies a general practice of all nations; there is no such general practice.   On the contrary, the action of other nations in respect to foreign judgments, indicates that there is not even a generally prevailing opinion which it would be practicable to make the basis of any rule of comity.   In examining the law of other countries we should keep in mind the tendency to overlook the essential distinctions, clearly indicated in our own law, between a foreign judgment as a ground for asking the issue of process to put the judgment in execution,—as a ground for the application of the law of estoppel on the principle of *res judicata,*—and as a ground for a civil action between the parties to the judgment. In England, if recent cases can be treated as not altering the common law which once prevailed there, the law in respect to foreign judgments is the same as our own; but among the dependent states of England marked differences exist. Among other nations there is an almost uniform rejection of any right in a foreign judgment creditor as against the judgment debtor, to enforce any obligations arising from their relations to such judgment.   There is an almost equally uniform rejection of any right to demand of the government, process by which a foreign judgment shall be put in execution.   Where such execution is granted at all, it is granted on conditions that are governed by no common principle. The nearest approach to a common principle is found in the general refusal to grant any execution, unless in pursuance of an express treaty or the implied treaty of recognized reciprocity of action.   Sweden and Norway refuse any recognition of foreign judgments.   Russia also refuses unless bound by a treaty.   Germany refuses except in cases where reciprocity is guaranteed.   The law of Austria is similar. France and Belgium practically refuse; for consent is given only after inquiry into the merits of the judgment.   A similar rule prevails in Portugal and Spain.   The refusal to execute any judgment on default against one of its own subjects is general.   Besides the differing rules of conduct established by special treaties, the various conditions upon which exe-

cution of a foreign judgment may be granted, include the following: That the judgment is satisfactory in the discretion of the executive; that it is satisfactory in the discretion of the court; that it is rendered in a country which guarantees reciprocity; that it meets various conditions specified by the local law; that it is not rendered on default; that it is shown to be just upon examination of its merits. The only government which unqualifiedly treats a foreign judgment (excluding however one which has been rendered on default of appearance) as a domestic one, is the republic of Liberia. (See collation of laws in Piggott on Foreign Judgments, 357 *et seq.*).

It is evident that such action furnishes no ground for claiming an existing " comity of nations ; " it rather indicates that the wished for uniformity of action must be secured through international treaties. The only countries where the duties arising between the parties to a foreign judgment can be enforced by civil action, are those where the common law is administered; and it may well be doubted if a more desirable and practicable basis for an international agreement on this subject can be found, than is furnished by the analogies of that common law.

It was in view of this condition of the usage of nations that LORD BLACKBURN, in *Godard* v. *Gray,* 6 L. R. Q. B., 139, 148, stated so emphatically: " It is not an admitted principle of the law of nations that a State is bound to enforce within its territories the judgment of a foreign tribunal; " and in *Schibsby* v. *Westenholz,* repudiated the suggestion that the principle on which foreign judgments were enforced was that which is loosely called " comity."

Closely connected with what has been said in respect to the office of a judgment, is the specious claim that the voluntary presence of a person within the territory of a State, implies an obligation to respect such legal process as may be served on him there, to the extent of satisfying any valid resulting judgment; and that such obligation is the one recognized by our common law as enforceable by a civil action in our courts. Such " implied obligation " is admittedly one due

from a person to the State, *i. e.*, to respect the process of the State—to obey the mandate of its judgment.    To call such an obligation " implied, " is but another form of expressing the old fancy of the social compact,—that all laws are binding by reason of an implied obligation.    This fancy cannot affect the fact that the lawfully expressed will of the sovereign directly imposes a legal obligation on the subject, and on all within his lawful power.    This is an obligation of obedience resulting from positive law.    Within the limit of the sovereign's power over an alien, the obligation due from such alien is the same as that due from a native subject.    So whatever obligation is due from the alien to respect the process and obey the judgment of the sovereign in whose territory he may be, is not implied (unless for the purposes of speculation), but is directly imposed by positive law, binding within, but not without, the territory of that sovereign.    Such an obligation cannot be the one enforced by our common law action ; because our law distinctly pronounces it invalid.    If the obligation is valid the judgment must be valid throughout.    If it binds one party to obedience to the mandate of payment for injury done, it must bind the other to obedience to the mandate of extinction of the original cause of action.    Our common law says the original cause of action is not extinguished, and the obligation of obedience cannot be enforced in our courts.

By this process of exclusion we are enabled to mark the limits of the obligation legal by our law, enforceable in our courts, which arises from the relation of the parties to the fact of a foreign judgment, so that its real nature can be ascertained with adequate accuracy.    It is not the obligation of obedience imposed by the command or sovereign act signified in the mere rendition of the judgment ; still less is it the " implied obligation " which the votaries of the social compact fancy to be the origin of all law ; it is not imposed by any rule of international law, nor by any existing " comity of nations."    All such grounds of obligation are excluded by the settled principles of common law.

The only remaining ground of obligation must be found

in the principle, well established and of constant application in our law, that when the relations of the parties to a fact or facts are such that the ties of natural justice require the performance of certain acts, such duty may be a legal obligation enforceable in our courts by an appropriate action. This principle is far from countenancing the claim that a mere moral duty must be a legal obligation. To come within the operation of the principle, the duty must be such as our law has recognized as legal, or at least be clearly and strictly analogous to recognized legal duties.

Our common law, in respect to the principle of *res judicata* and its application, distinctly recognizes as legal, a duty resulting from the ties of natural justice, to accept as true, in future proceedings, the facts established in a judicial contention, when the parties have participated in such contention and submitted the controverted facts to such adjudication. In speaking of the principle of *res judicata*, I do not mean the fiat of the State which compels obedience to a final judgment and forbids the parties to again contest the cause of action extinguished by that judgment (although such meaning is properly expressed in the broad use of the term), but I confine the term to its expression of the principle by which the parties are bound in other proceedings by the facts once submitted by them to a final adjudication. In examining the relation of this principle of *res judicata* to a foreign judgment, we must remember that there is a vital distinction between a foreign judgment *in rem* and the ordinary foreign municipal judgment *in personam*. It is true, that to a certain extent the principle of *res judicata* applies in the same manner to both; but there is a principle which controls judgments *in rem* that has no application to municipal judgments. This principle most clearly appears in the case of courts of admiralty administering justice in accordance with international law. The principle is, that certain courts by the law of nations exercise a jurisdiction co-ordinate with that of other like courts throughout the world, and that their judgments in determining the status of certain things and persons are adjudications to which all the world are parties, and

have in every nation a binding force equivalent to the judg-
ments of the courts of that nation.   As early as 1674 this
principle was outlined in *Hughes* v. *Cornelius*, 2 Show., *232,
and was developed in the judgment announced by LORD
MANSFIELD in *Bernardi* v. *Motteux*, 2 Doug., 575.   In *Roach*
v. *Garvan*, 1 Ves. Sr., 157, LORD HARDWICKE declares that
the principle results " from the law of nations in such cases ;
otherwise the rights of mankind would be very precarious
and uncertain."   This principle has been affirmed by our
Federal Courts.   In *Croudson* v. *Leonard*, 4 Cranch, *434,
JUSTICE JOHNSON rests the principle, in the case of a court
of admiralty, on considerations of necessity and the impro-
priety of revising the decisions of the maritime courts of
other nations whose jurisdictions are co-ordinate throughout
the world; and in *The Mary*, 9 Cranch, 126, CH. J. MARSHALL
states that these reasons given by JUSTICE JOHNSON must
be taken as the unanimous opinion of the court.   The prin-
ciple was recognized in *Stewart* v. *Warner*, 1 Day, 142, and
was fully sanctioned by a unanimous judgment of this court
in 1810; CH. J. SWIFT in delivering the opinion, based the
conclusion distinctly on " our acknowledgment of the *law of
nations.*"   *Brown* v. *Union Ins. Co.*, 4 Day, 179, 186.   The
law of nations was adopted by the legislature as a rule of
adjudications in our courts of admiralty in 1776.   15 Colonial
Records, 281.

The same principle extends, with some modifications, to
courts exercising a peculiar jurisdiction in respect to the
status of marriage and of universal succession.   *Roach* v.
*Garvan*, 1 Ves. Sr., 157 ; *Tomkins* v. *Tomkins*, 1 Story, 547,
553 ; *Holcomb* v. *Adams*, 16 Conn., 127.

While judgments of this class have a legal effect in all
nations which recognize international law as a part of their
municipal law, judgments *in personam* of municipal courts
have no extra-territorial effect by virtue of international law ;
so that language used in discussing one class of judgments
may produce confusion if applied unqualifiedly to the other.

The principle of *res judicata* found its earliest application
in a technical effect given to the document called a record,

containing a portion of the proceedings of a superior common law court. This technical rule was, in its inception, applied only to records of those courts whose proceedings were kept in this peculiar manner; it did not extend to inferior courts, nor to the High Court of Chancery. A similar technical rule applied, as between the parties, to the recitals of a deed. The " record," and the deed as between the parties, was treated as importing an absolute verity which could not be attacked collaterally; every one was estopped from making such attack. And so the principle of *res judicata* has been treated as belonging to the law of estoppel, and shared in early days the odium pertaining to a technical rule which closed the gates of justice to the entrance of truth.

But this technical rule, although still recognized, is not the ground on which the principle of *res judicata* rests. Its real foundation must be sought in principles which pervade all jurisprudence; in the considerations of public policy, which recognize that the adjudications of courts cannot serve their legitimate purpose unless final; in the universal law of equity and justice, which forbids parties who have once submitted their differences to the final decision of a court of competent jurisdiction, to question a result induced by their own act; and so the protection of *res judicata* does not depend upon the mere contents of court documents kept in a particular manner, but also, in some cases, upon the question whether the matter in dispute has in fact been submitted by the parties to a court, has in fact been heard, determined and finally decided by that court. The estoppel involved in the establishment of such facts is more than the old technical estoppel of record; it rests on matter *in pais*, and partakes of the nature of an equitable estoppel. *Supples* v. *Cannon*, 44 Conn., 424, 429; *Sargent & Co.* v. *N. H. Steamboat Co.*, 65 Conn., 116, 126. It is evident that while an estoppel dependent on the particular form of a document peculiar to certain courts, must of necessity be confined to the judgment of those courts, the estoppel involved in the principle of *res judicata* must of necessity apply to the judgments of all courts exercising a competent and final juris-

diction.  The principle broadly stated is this : A claim once
submitted by the parties to a court of competent jurisdiction,
fully heard, determined and decided by that court, shall not
thereafter be controverted between the same parties.  This
principle is entirely distinct from the right, given by law to
a party to a judgment, to ask the State to exercise its sover-
eign power in compelling obedience to that judgment.  It
is simply a principle of jurisprudence firmly established in
our municipal law, and based on considerations so general in
their application, so clearly equitable and essential in any
administration of justice, that it may fairly be called a uni-
versal principle of jurisprudence.  The principle does not,
and from its very nature cannot, depend upon the particular
court whose judicial action has been invoked, so long as its
jurisdiction is competent and its judgment final.  It applies
wherever the parties have so submitted their claims to a final
decision by a court of competent jurisdiction, whether that
court be inferior or superior, of law or of equity, domestic or
foreign.

The only difference between a domestic and a foreign judg-
ment in respect to the application of this principle, is a ques-
tion of evidence.  Can the laws of a foreign country, which
prove that the foreign court was in fact a court of competent
jurisdiction, and that the controverted claim was in fact sub-
mitted by the parties, heard, determined and finally settled
by the court, be admitted in accordance with the rules of
evidence established by our municipal law ?  If the foreign
laws are admitted in evidence, the fact proved by them must
have like effect with a similar fact proved in the case of a do-
mestic judgment.  The admissibility of proof of foreign laws
for the purpose of establishing the judicial character of a
court, and the legal effect of its acts, as well as the legal effect
of all acts done in a foreign country under the laws thereof,
is thoroughly established as a part of our municipal law.
Whether we call this law a rule of comity of nations, is imma-
terial to the matter in hand.  It is a part of our law, and de-
rives its force from that fact ; and foreign laws, as conclusive
evidence of the legal effect of acts done under them, are re-

ceived by virtue of our law, with the vital qualification stated by Story: " unless they are repugnant to its policy, or prejudicial to its interest." Story on the Conflict of Laws, § 38.

It may avoid some confusion, to call attention here to the practical distinction between the admission in evidence of the acts and laws of a foreign sovereign, and the recognition of the necessary effect of such acts and laws in the determination, as between parties, of the result of their agreements or conduct while within the operation of such foreign law; and the putting in execution within our territory of the command of a foreign sovereign. The former results from a principle of our municipal law deemed essential to the administration of justice; in assuming that the real obligations of the parties are controlled by the fact that they arose or were undertaken with reference to the law prevailing where their acts were done, our courts do not assume to execute a foreign law, although the obligation they enforce as legal under our own law may also find its ultimate source in the command of a foreign sovereign; they treat the foreign law as a fact essential in connection with other facts, to ascertain what the parties really meant by what they have done, and if in receiving and weighing such fact they may also theoretically enforce the will of a foreign sovereign, it is only as an incident to the exercise of the judicial power vested in the courts, and does not offend the sovereignty of the State where such law may be proved as a fact. But the execution of a foreign law as ordinarily understood, is practically a very different thing; it cannot be authorized by the judicial department; and is an offense to our sovereignty unless permitted by special legislation. This distinction is clearly marked in the case of a foreign judgment, which is merely an act or special command of a foreign sovereign. Its execution within our dominion is an offense to our sovereignty; is forbidden by our law. Our courts deny such execution, both by refusing to recognize any extinction of the original cause of action by the judgment, and by refusing to issue process to enforce the obligation of obedience to its command. But when obligations between the parties, other than the mere obligation of obe-

dience, may arise from or be supported by the fact of such foreign judgment, it is admitted in evidence as a fact material to the determination of such obligations.

The principle of res judicata as stated and its application to conditions resulting from a foreign as well as from a domestic judgment, subject to the rule of evidence as stated, is a firmly established principle of our common law. In its earliest application to foreign judgments some doubt was entertained as to its equal conclusiveness in such cases, as appears from the arguments of counsel in the *Duchess of Kingston's Case ;* but such doubts arose from a confusion of principle with a question of evidence, and never received judicial sanction. The principle cannot now be questioned. *Bissell* v. *Briggs,* 9 Mass., 462 ; *Taylor* v. *Phelps,* 1 Har. & G. (Md.), 492 ; *Konitzky* v. *Meyer,* 49 N. Y., 571 ; Story on the Conflict of Laws, § 598 ; CH. J. EYRE in *Philips* v. *Hunter,* 2 H. Bl., 402 ; *Aldrich* v. *Kinney,* 4 Conn., 380. "It is an established rule, that a foreign judgment, when used by way of *defense,* is as conclusive, to every intent, as those of our own courts." GOULD J., in *Griswold* v. *Pitcairn,* 2 Conn., 85, 92.

But the principle is based in part on the universal law of justice and equity which binds one to submit to a final decision resulting from his own acts, and should not be extended beyond the limits of its foundation. Where in fact both parties to the controverted claim have not been heard, and judgment has not been rendered upon a claim contested and adjudicated, but the only adjudication between the parties is a mere legal fiction, for a penalty imposed for a disobedience of process issued by the court ; while such judgment may be enforced as the command of the State, binding on its citizens, this particular foundation of res judicata does not exist. The distinction between the principle of a judgment as a bar to recovery in a cause of action which has been extinguished by the judgment, and this principle of res judicata, is indicated in *Smith* v. *Sherwood,* 4 Conn., 276. The former controls when the estoppel is what was formerly called estoppel by judgment ; the latter where it was called estoppel by verdict ; the former is founded on the supremacy

of a sovereign within his own territory; the latter is a universal principle of jurisprudence, and can only apply to a fact " tried and found between the parties." This distinction was affirmed in *Bradford* v. *Bradford*, 5 Conn., 127, 132. The defendant, in pursuance of notice under the general issue, offered in evidence as bar to the action, a judgment by default; and the court said, " no estoppel is created by a default." (HOSMER, C. J., in his opinion, assumed that the judgment by default involved the same legal consequences as if there had been a verdict under the general issue, the record not disclosing the ground of the verdict, and added: " there existing no solid distinction, between a title confessed, and one tried and determined." This saying applies only to the effect of a judgment by default in respect to the special cause of action it determines. It does not assert that a judgment by default is an adjudication between the parties, within the meaning of *res judicata;* an assertion which is expressly negatived by the opinion. And the saying is not strictly accurate under our practice. It was used by the English judges in respect to the old action of ejectment, at a time when judgment by default could only be rendered after the appearance of the defendant, when his neglect in open court to deny the allegations of the plaintiff was treated as a confession. *Aslin* v. *Parkin*, 2 Burr., 665. The settled principle of our law being that a common law court has no jurisdiction for the purpose of adjudication, until both parties appear in court and submit to the jurisdiction. In the modern practice of judgment by default, this principle is evaded through a legal fiction. 1 Reeve's, Hist. of Eng. Law, 452; 3 Bl. Comm., 279).

" A judgment by default determines nothing except the plaintiff's right to recover in that action." *Lord* v. *Litchfield*, 36 Conn., 116, 131. In *Cromwell* v. *County of Sac*, 94 U. S., 351, 356, FIELD, J., in illustrating the principle that an estoppel by judgment in a former action on a different cause exists only where the controverted claim was in fact litigated and adjudicated, says: " A judgment by default only admits for the purpose of the action the legality of the

demand or claim in suit; it does not make the allegations of the declaration or complaint evidence in an action on a different claim." In a recent case in England, where a judgment by default of appearance in a French court was set up as a bar to the claim, the court held that such a judgment did not come within the rules of *res judicata* which calls for a judgment on the merits, and a judgment in default of appearance is one on a matter of form only; and SIR ROBERT PHILLIMORE, delivering the opinion of the court says: "The foreign judgments not having been given on the merits of the case, but on matter of form only, cannot be set up as a bar to a decision on the merits." *The Delta*, L. R. 1 P. D., 393; *Frayes* v. *Worms*, 10 C. B. N. S., 148.

As the principle of *res judicata* established and administered by our common law, is based not only on considerations of public policy, but in part upon the obligation arising from ties of natural justice, it recognizes as legal the duty arising between parties who have contested a controverted claim before a judicial tribunal, thereafter, as between themselves, in a judicial proceeding to accept as true the facts adjudicated upon such contest. This principle may be invoked by plaintiff or defendant, to defeat or support an action; as it depends in part upon the equities arising from the relation of the parties to the fact of adjudication, and not wholly on the form of a judgment or its effect in compelling obdience to a particular command, it applies in the case of any final judgment, whether rendered by a superior or inferior court, whether foreign or domestic. This legal duty to accept as true such adjudicated facts in subsequent judicial proceedings, necessarily involves the duty to pay any sum the facts so adjudicated conclusively prove to be due. The obligation is not like the one arising from the mere command of a foreign State, intra-territorial; but, as in the case of many transactions outside our territory which give rise to an obligation legal under our law and not illegal by the law of the place, it is transitory in its nature and enforceable in our courts. *Ruckmaboye* v. *Mottichund*, 8 Moo. P. C. C., 4; *Scott* v. *Seymore*, 32 L. J. Ex., 61.

Fisher, Brown & Co. *v.* Fielding.

The necessary result of established principles discloses the real nature of the obligation in question.   It was recognized by the ancient common law, but it did not come within the few specific forms of action.   It did come within the ac tion on the case established for the enforcement of all rights not within those specific forms, including obligations arising from the ties of natural justice.   Y. B. 14 Henry VIII., 31. The convenient fiction of *indebitatus assumpsit* was applied to this obligation, on the same principle that it was applied to the obligation to pay money in the hands of the defend- ant; not by reason of any contract or of any delict, but under such circumstances that it equitably belonged to the plaintiff.   *Moses* v. *MacFerlan,* 2 Burr., 1005, 1008.   Con- trolled by this fiction, the foreign judgment stood for the consideration of the promise.   *Walker* v. *Witter, supra.*   It was treated as the *prima facie* cause of action (*Philips* v. *Hunter, supra; Houlditch* v. *Donegall,* 2 Cl. & Fin. 470), *i. e.* the fact of the consideration or judgment established the plaintiff's case, unless the defense set up facts which im- peached the consideration, that is, such facts as proved the judgment to have been rendered under circumstances that negatived any obligation between the parties.   *Russell* v. *Smyth,* 9 M. & W., 810; *Williams* v. *Jones,* 14 L. J. Ex., 145; *Godard* v. *Gray,* L. R. 6 Q. B. 139; *Schibsby* v. *Westen- holz,* ibid., 155.   The fictitious character of the action first used to enforce this obligation, has been the cause of confu- sion which has now no excuse.   The fictions of the remedy removed, the essence of the obligation clearly appears.   It is this: When a valid and final judgment has been rendered in respect to controverted claims tried and determined upon their merits, there arises a *quasi-*contract obligation as be- tween the parties to such judgment, which binds them in future proceedings to admit the facts so adjudicated to be true, and to pay over money whose ownership as between themselves has been established by such adjudication.

This obligation exists in the case of every judgment ren- dered under the conditions described.   It might be enforced, if there were occasion, in the case of a domestic judgment ; it

has not been so enforced, because the wider and more effective obligation of obedience has excluded its consideration; the remedy by execution, whether with or without the intervention of other formality, is so complete, that there has been no occasion to resort to the *quasi*-contract obligation. But in the case of a foreign judgment the obligation of obedience does not exist, no remedy by execution direct or indirect exists; the only obligation enforceable in our courts is the one arising between the parties to any judgment when there has been an adjudication to which the equitable principle of *res judicata* applies.

The determination of the nature of the obligation simplifies the problem of defenses. "Anything which negatives the existence of that legal obligation, or excuses a defendant from the performance of it, must form a good defense to the action." *Godard* v. *Gray, Schibsby* v. *Westenholz, supra.* If in fact the judgment is a mere expression of sovereign will which does not involve any actual adjudication of claims put in issue by the parties and tried and determined by the court, the particular principle of *res judicata* essential to the right of action does not apply, and such fact must negative the obligation of which the judgment is considered as *prima facie* evidence. If the adjudication resulted from the fraud of the plaintiff, such fraud of necessity vitiates the foundation of the obligation. *Abouloff* v. *Oppenheimer*, L. R. 10 Q. B. D., 295; *Vadala* v. *Lawes*, L. R. 25 id., 310. But if in fact the final result of the adjudication was not justified by the evidence produced on the trial, such fact cannot constitute a defense; the obligation sought to be enforced is not concerned with the merits of the controversy submitted to adjudication; it arises solely from the fact of such adjudication under the required conditions; the original controversy is not in issue; the trial court has no power to determine that question nor to review by way of appeal or error the judgment of a foreign court (*Messina* v. *Petrococchino*, L. R. 4 P. C., 144); the fact of the judgment and the conditions under which it was rendered are in issue, but not the merits of the controversy adjudicated. Upon the invalidity of such

a defense, the actual results of decided cases are practically uniform. In all the recent American cases where the courts have refused to receive evidence upon the merits, the defendant had appeared in the foreign court and defended. *Lazier v. Westcott*, 26 N. Y., 146, 151; *Dustan v. Higgins*, 138 N. Y., 70; *Baker v. Palmer*, 83 Ill., 568; *McMullen v. Richie*, 41 Fed. Rep., 502. (Since this opinion was written, the opinions in *Hilton v. Guyot*, 159 U.S., 113, and *Richie v. McMullen*, ibid., 235, have been filed. In these cases also, the defendants had appeared in the foreign court and there had been an actual adjudication upon the claims presented. Whether the exhaustive examination made of the history of this action, justifies the theory advanced by a majority of the judges, and whether a theory so novel to English and American law will hereafter control the treatment of defenses by the Federal courts, may be doubtful).

There is a defense which depends rather on a question of evidence. Our municipal law admits in evidence a foreign judgment and foreign law, *unless* repugnant to the policy of our law or unjust and prejudicial to our own subjects. A judgment obnoxious to this exception might not be admissible as evidence, and so the action might be defeated. In *Castrique v. Imrie*, 30 L. J. C. P., 177, the distinction in this respect between a judgment *in rem* and *in personam* was noted. In *De Brimont v. Penniman*, 10 Blatchf., 436, a demurrer was sustained in an action brought to enforce an obligation between the parties arising in France under French law and established by a French judgment, after full contest by the parties, on the ground that the foreign law and judgment was repugnant to the policy of our law and did violence to the rights of our citizens. The claim that evidence of a foreign judgment may be rejected because the courts of the state where the judgment was rendered do not receive in evidence our own judgments, would fall under this defense. The object sought by such a claim seems more political than judicial; it is not so much to administer justice in the case on trial, as to compel other nations to administer justice in other cases. It may be doubted whether the accomplishment

of such an object by such means, fairly comes within the province of a court. Reciprocity is not a principle to be weighed in the scales of justice; it is rather a weapon to be wielded by the executive. The other defenses are—the invalidity of the judgment, which must be determined by the law of the state where rendered; payment, release, etc.

In the present case, the facts alleged in the second defense conclusively show that no obligation can be predicated in respect to the judgment produced, except that of obedience imposed by the act of a foreign sovereign, which has no extraterritorial force, and cannot support this action; that the facts technically established by the judgment are conclusive only for the purposes of the action in which it was rendered, and within the limits of the foreign state; that the conditions which under our law support a legal obligation between the parties arising from the equities of the case and the ties of natural justice, have no existence. The operation of the principle of *res judicata* upon facts actually adjudicated, and the equities involved by some actual participation in such adjudication, are essential to the *quasi*-contract obligation this action is brought to enforce. These conditions are negatived by the allegations of the second defense. The demurrer to that defense should therefore have been overruled.

The conflict of dicta, and even of results reached in adjudged cases, is such that it is impossible to explain any principle as the real ground of this action, without running counter to some general language of courts or text writers. LORD CAMPBELL said, in *Bank of Australasia* v. *Nias* (16 Ad. & El. N. S. 717, 734), " there is no advantage in going over the authorities, or in attempting to reconcile or contrast them."

The conflict which has induced most comment, is that between the cases holding that a foreign judgment is *prima facie* evidence only, and those holding that it is conclusive on the merits of the claim adjudicated. This conflict is substantially reconciled when the true ground of the action is considered. LORD HARDWICKE, CH. J. EYRE, LORD MANS-

FIELD, and others cited in support of the former dictum, were speaking of the judgment when produced as the cause of action, as the ground of a common law obligation ; and as such it is only *prima facie* evidence, that is, the conditions necessary to raise the obligation do not attach to every foreign judgment. LORD CAMPBELL and others, cited in support of the latter dictum, were speaking of the effect of the judgment when its conditions are such that the common law obligation is raised ; in such case it is conclusive ; the merits of the controversy adjudicated cannot be tried in an action to enforce the obligation arising from the fact of that adjudication.

But the expressions used when a foreign judgment on default has been under discussion, are more variant and less clear ; and for the most part they have not as yet received practical application. So far as results are concerned, an action has never been sustained by this court, and I believe by no American court, in the case of a foreign judgment rendered on default of appearance ; and has rarely been sustained in England. The principal English case is *Douglas* v. *Forrest*, 4 Bing., 686. A Scotchman, absent beyond the seas, was summoned to court by the peculiar process called " horning," which consisted I believe, in blowing a horn at the cross of Edinburgh. Not responding to the summons, judgment against him was rendered. An action was brought in England to recover the amount of this judgment, and sustained. If the court acted on the theory that the division between the jurisdiction of Scotch and English courts was one imposed by an imperial government in respect to subject provinces, and not the division existing between the courts of foreign and alien states—a distinction drawn by LORD SELBORNE in *Sirdar Gurdyal Singh* v. *Rajah of Faridkote*, L. R. (1894) App. Cas., 670—its decision is explicable. On that theory it might well treat the judgment as in effect an English judgment, and entitled to execution ; such was the real condition, and forty years later an Act of Parliament (the Judgment Extension Act of 1868) recognized its existence and provided for the execution of Scotch judgments in

England and English judgments in Scotland, upon regis-
tration.   But if the court regarded the action as one to en-
force the obligation that arises in respect to a judgment
strictly foreign, its conclusion can only be supported on the
theory that by force of the ties of allegiance a subject is
present for all purposes of adjudication in the courts of his
sovereign when commanded to be present, and that this fic-
tion may be treated in such case as the equivalent of an
issue actually presented by the parties, tried and determined
by the court, and so support an action based upon an obli-
gation arising from such actual adjudication.   The court is
careful to expressly limit its judgment to " a case where the
party owed allegiance to the country in which the judgment
was so given against him, from being born in it; and by
the laws of which country his property was, at the time the
judgment was given, protected;" and when the debt was
contracted in the country of the judgment while the debtor
resided in it.   It is evident that the adoption of such fiction
would modify the principle which supports our action on a
foreign judgment.   Whether any such modification can con-
sistently be recognized, and if so, to what extent, has not
been considered by our courts.   This much is certain—and
that is enough for the present case,—no modification can be
so extended as to destroy the principle.   It is plain that no
action can be sustained in the case of a judgment rendered
on default of appearance against one of our own citizens,
whose only connection with the foreign sovereign was that
of a mere passenger through his territory, without wholly
ignoring the principle on which the action is based.   The
proceeding would no longer be a civil action to enforce a
common law obligation, but would be a mere form of ob-
taining from the court a writ of execution on a foreign judg-
ment.   And so the questions which have been discussed in
several cases subsequent to *Douglas* v. *Forrest*, in respect
to the international jurisdiction of a municipal court—mean-
ing a jurisdiction conferred by a sovereign and recognized
by international law, as distinguished from a jurisdiction so
conferred and not recognized by that law—were both induced

and obscured by an uncertainty as to what the action on a foreign judgment really is. If it is an action to enforce an ordinary obligation arising from the participation of the parties in an adjudication resulting in a valid final judgment, the question of jurisdiction is not a troublesome one; it is settled for most purposes of the action (as in other cases where foreign law is admitted in evidence) by the law of the country where judgment is rendered. But if the proceeding is not an ordinary civil action, but, like debt on a domestic judgment, is a mere form for procuring from our government the issue of an execution on a foreign judgment, then the speculations on the jurisdiction of municipal courts internationally considered, as it is phrased, may be useful; *but only* as guiding the discretion of the court. For nothing is more fixed than that a municipal judgment cannot receive execution in a foreign country, unless by permission of the government of that country; and nothing is more certain than that the conditions of such permission are controlled by no international law or custom, but are determined by the views of public policy held by the authority exercising the sovereign power in granting the permission. The rule is the same whether that authority is judge or king. If our courts assume the power of the government to put in execution within our territory the judgments of foreign sovereigns, they must assume the duty of the government in fixing the conditions on which such executions shall issue. These conditions of necessity must be controlled by views of public policy. The duty of the court in this particular is not strictly a judicial one. There is no settled law which dictates the policy. There are variant opinions as to what the international law in respect to the execution of foreign judgments ought to be, supported by reasoning useful in developing a sound theory of jurisprudence; but there is no international law except the universally admitted law that execution can only be granted at the will of the sovereign in whose territory it is sought.

The nearest approach to an international rule is the one laid down by LORD SELBORNE in one of his last opinions:

" The plaintiff must sue in the court to which the defendant is subject at the time of the suit ('*actor sequitur forum rei*') ; which is rightly stated by Sir Robert Phillimore to lie at the root of all international, and of most domestic, jurisprudence on this matter." *Sirdar Gurdyal Singh* v. *Rajah of Faridkote, supra.* It is true, our municipal law adopts the policy (possibly questionable) of offering our courts for the litigation of the whole world, assuming jurisdiction of any defendant who comes within the range of our process. Within our own limits such policy is the law. But the adoption by one nation, in the administration of its municipal law, of a policy differing from that on which established international law is based, does not of itself abrogate that law; much less can such municipal policy have the force of international law.

The more important consideration, however, is that there is no international law which recognizes the right of one nation to conclusively determine the legal duties of the subject of another nation who may be temporarily within its limits, in respect to transactions occurring at his own domicile and not related to any act or conduct within the foreign territory. Territorial jurisdiction, or the right of might to exercise its own will on all persons within its territory, asserted by each independent nation, is countered by the right of protection of its citizens while guests of foreign governments, asserted by every civilized nation. This right of protection is maintained in unmistakable terms by our own government: " The United States believe it to be their duty, and they mean to execute it, to watch over the persons and property of their citizens visiting foreign countries, and to intervene for their protection when such action is justified by existing circumstances and by the law of nations." 2 Whar. Dig. Int. L., 434. All jurists affirm that the power over the person of a friendly alien who is a mere passenger through a nation's territory, is limited to matters relating to his acts and conduct while within that territory. Phillimore emphasizes the warning that the distinction between domiciled persons and visitors or passengers is never to be

lost sight of. 2 Int. Law, *4. An alien has no legal right enforceable by action, to enter foreign territory; *Musgrove* v. *Chun Teeong Toy*, L. R. (1891) App. Cas. 272; but if he is permitted to enter, he carries with him his allegiance to his own country and is still bound by the laws of that country. *Philips* v. *Hunter*, 2 H. Bl., 402; *Henderson* v. *Staniford*, 105 Mass., 504. He carries with him the protection of that country, and owes no duty or *quasi*-allegiance to the foreign sovereign which can support the conclusive jurisdiction of his courts, unless in respect to conduct while there, or acts there done. Story on the Conflict of Laws, § 613.

The adjustment of territorial jurisdiction as based on the brute force of might, to the principle of protection as based on the reciprocal duties between sovereign and subject which exist wherever the subject may be, is now making international law. It is still within the range of diplomacy. But it is enough for present purposes, that there is no international law by which a citizen of London or New York, traveling in Turkey or Morocco, can be compelled by reason of the mere fact of his casual presence in the foreign country, to there litigate controversies arising at his own domicil. When our court, in the exercise of its assumed power, is asked to grant execution of a judgment based on the right of such compulsion, its decision on the question of policy is controlled by no rule of international law. And certainly there can be no doubt but that public policy demands the refusal of execution in such case. It can hardly be claimed that the interests of our own citizens, or friendly intercourse with other nations, will be served by encouraging the establishment of a sort of international syndicate for promoting the collection of home debts, through foreign courts, so that each traveler shall be compelled to run the gauntlet of such litigation under threat of snap judgments, upon which his own government must issue execution on his return. Such a policy would offer premiums to scavengers of sham and stale claims at every center of travel, breeding a class of process firers to lie in wait for their game at docks and railway stations. It is certainly significant that since the first case on this subject

was reported, no English or American court has in fact sustained an action on a foreign judgment, rendered on default against one of its own citizens, in respect to a cause of action arising at his domicil, and that no nation, so far as can be ascertained, has ever suffered such a judgment to be put in execution within its territory.

It seems clear to me, notwithstanding some *dicta* entitled to the highest respect may support a contrary view, that if this proceeding is, as I have attempted to prove, a common law action to enforce a common law obligation, the facts set up by the defendant constitute a good defense; and if it is—as some general language used by courts, especially of late years, seems to imply—a mere form for procuring the issue of execution on a foreign judgment, the facts set up are conclusive against the issue of execution on the judgment produced.

The argument from analogy, much pressed by counsel, has been substantially disposed of in reaching the conclusions stated.   The argument is: 1. A judgment on default obtained in Connecticut against a non-resident served with process while transiently in the State, is valid and will be enforced in this State.   2. Under the Constitution of the United States, such judgment has the same effect and will be enforced in every other State.   3. Some analogy exists between the relation of the States to each other, under the Constitution, and the relation of independent and foreign nations to each other; *ergo*, such a judgment obtained in a foreign nation will be enforced in the United States.   The gap between the premises and the conclusion is patent, and impassable if the essential premise omitted is supplied, *i. e.*, the sovereign power signified in the judgment of a State court extends, by force of the United States Constitution, to all subjects of the one nation throughout its whole territory; while the sovereign power signified in a foreign judgment does not extend beyond the limits of that nation, and can be recognized elsewhere only by the grace of some other nation.

The character of a State judgment as representing the sovereignty of the nation as well as of the State, and so unal-

terable by State action, is well settled. *Christmas* v. *Russell*, 5 Wall., 290. JUSTICE CLIFFORD says such judgment is " equally binding and may be executed in every State. The established rule is, that so long as the judgment remains in force it is of itself conclusive of the right of the plaintiff to the thing adjudged in his favor, and gives him a right to process, mesne or final, as the case may be, to execute the judgment." Such fanciful analogies as the one alleged between the effect of a State and foreign judgment, when produced for execution within the sovereignty of the United States, are unsafe as well as unreal.

There was a clear analogy between the relations of the several States to each other, and the relations of foreign nations, from the opening of the Revolution to its final consummation in the adoption of the Constitution of 1787, and the establishment of the new " composite republic," as it has been aptly termed by Austin. But these analogies were then radically disturbed. The nation and the government established was new, absolutely unique, and cut loose from the traditions and analogies that had formerly prevailed. And so the division of sovereign powers between the people as citizens of one nation and as citizens of its component parts, the relations of such governments to each other, the relations of citizens to the State and to the general government, in their double and not inconsistent capacity of citizens of the United States and of the several States; in short, the new and intricate conditions involved in the establishment of the " indissoluble union of indestructible States," must be settled in accordance with the law and circumstances which called the new nation into existence; which law of necessity is peculiar to itself. It is only by acknowledging the fact that the relation of our citizens to their government and its several parts, are to be determined by a law peculiar to that government and necessarily distinct from that controlling the relations of foreign governments and their citizens, that we can distinguish between the constitutional law which controls the relations of all States and citizens within the scope of the Federal Constitution, and the international law which con-

trols the relations of foreign nations and their citizens, and be able to accurately apply each law to its appropriate subject. The United States Constitution declares that the act of sovereignty signified in a judgment of one State shall receive execution in every State. International law declares that such act of one nation is not entitled to execution in any other; and the law of this State forbids such execution. The defense in this case brings into sharp contrast the two views of this action which have apparently influenced courts, especially in their discussion of defenses. One view recognizes a common law obligation arising from facts proved, the other a governmental duty called into action by the verification of the act of a foreign sovereign; the defenses under one turn on questions of law, under the other on questions of policy. It is therefore essential for the application of any principle to cases as they arise, that one or the other view should be frankly adopted and its logical consequences accepted.

For the reasons stated, I believe the view which regards this proceeding as a common law action to enforce a common law obligation, to be the only one consistent with the established principles of our municipal law, and that such obligation is expressly negatived by the defense in this case. If, however, the other view can be maintained, I believe the defense is sufficient, although for different reasons.

I think there is error in the judgment of the Superior Court.